IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                      CRIMINAL ACTION NO. 2:22-cr-00093

SAMUEL PIERRE JOSEPH,

        Defendant.

**ORDER**

Pending before the Court is Defendant's Motion to Suppress Evidence Obtained in Violation of the Defendant's Constitutional Rights. (ECF No. 26.) For the reasons discussed below, the motion is **DENIED**.

*I.    BACKGROUND*

Defendant's motion challenges two separate seizures occurring during arrests on two different dates. The motion seeks to suppress all evidence flowing from the two arrests.

    a.  December 27, 2021

First, on December 27, 2021, Detective Johnson of the Metropolitan Drug Enforcement Network Team ("MDENT") got a tip from a source about drug activity at the Knights Inn on MacCorkle Avenue SE in Charleston, West Virginia. (ECF No. 28 at 2.) The source described a black male wearing gray sweatpants and a hooded sweatshirt and alleged that the smell of marijuana was coming from Room 115, the room in which the male was staying. (*Id.*) Further,

1

the source informed Detective Johnson that the male was potentially selling heroin.  (*Id.*) Finally, the source told Detective Johnson that "the suspected drug dealer had left the room around 11:40" that morning.  (ECF No. 26 at 2.)

After receiving this information, Detective Johnson went to an area across the street from the Knights Inn at approximately 12:30 P.M. to conduct surveillance on the room from an unmarked car.  (ECF No. 28 at 2.)  He observed no activity for several hours, and at approximately 4:30 P.M., Detective Johnson and another officer knocked on the door of the room. (*Id.*)  Nobody answered, but while waiting for a response, Detective Johnson noticed that the room's window blinds were open and the lights were on inside.  (*Id.* at 2-3.)  In clear view through the window, Detective Johnson claimed to observe "a digital scale, several plastic sandwich bags, and some pieces of folded paper on a table," along with "additional plastic bags . . . sitting on the bed."  (*Id.* at 3.)  Based on his training and experience, Detective Johnson knew these items "to be commonly used in drug trafficking."  (*Id.*, *see also* ECF No. 26 at 2 (describing the alleged items as "drug paraphernalia").)

Following this observation, Detective Johnson briefly left the area and returned at approximately 7:45 P.M. to continue surveillance of the room.  (ECF No. 28 at 3.)  Less than an hour later, at 8:30 P.M., Detective Johnson saw a vehicle park in front of the room.  (*Id.*)  At that time, a man matching the source's description—"a black male in a sweatsuit"—and later identified as Defendant, exited the vehicle and entered Room 115.  (ECF No. 26 at 2.)

As the vehicle left, Detective Johnson followed it and performed a traffic stop.  (ECF No. 28 at 3.)  The driver initially lied to Detective Johnson about where she had dropped the man off and claimed to have done so at a nearby McDonald's.  (*Id.*)  After being confronted on the matter,

2

the driver admitted to the lie and said that she had actually dropped of an "out of town dude" at the hotel. (*Id.*) The driver's actions and statements, along with the fact that she claimed to have been paid for the ride, further led Detective Johnson to believe Defendant "was involved in drug trafficking." (*Id.* at 3-4.)

Detective Johnson then returned to the Knights Inn to resume surveillance. (ECF No. 28 at 4.) At approximately 9:50 P.M., Detective Johnson observed Defendant leave the room carrying a black duffel bag. (*Id.*) According to Detective Johnson, Defendant "was looking in different directions" apparently "trying to see if he was being watched." (*Id.*) Detective Johnson further claims that "Defendant walked briskly" to the McDonald's across the street. (*Id.*) After entering the McDonald's, Defendant briefly "entered the restroom" out of sight of Detective Johnson. (ECF No. 26 at 3.) Upon returning to the lobby, Defendant "began to pace back and forth . . . without approaching the counter." (ECF No. 28 at 4.)

At this time, Detective Johnson—in uniform—approached the side door of the McDonald's in clear view of Defendant. (ECF No. 28 at 4.) During Detective Johnson's approach, Defendant "attempted to leave the restaurant using another door." (*Id.*) Patrolman Clendenin—a second uniformed officer who had arrived to assist Detective Johnson—then encountered Defendant in the parking lot of the McDonald's and "ordered" him "to stop." (*Id.*)

Defendant did not stop. Instead, he took off away from the officer and "threw down his duffel bag and began to run towards" an adjacent property. (ECF No. 28 at 4.) After a short chase, Defendant was caught and handcuffed by Patrolman Clendenin. (*Id.*) The two officers then "collected defendant's duffel bag, which was unzipped and open at the top" and took Defendant back to their vehicle. (*Id.* at 4-5.) Defendant then consented to a pat down, and

Detective Johnson discovered a knife with "white powdery residue on it" on Defendant's waistband, along with "a sum of United States currency" and "a hotel room key." (*Id.* at 5.)

Around this time, while holding the bag, Detective Johnson "felt a pistol through the side." (ECF No. 28 at 5.) Though Defendant admitted the duffel bag was his, he declined to give the two officers consent to search it. Because of this, Detective Johnson "allowed his canine partner . . . to sniff the area of the bag." (*Id.*) During the sniff, "[t]he canine provided a positive indication on the bag for the odor of controlled substances." (*Id.*) Detective Johnson then secured the bag and obtained a search warrant from a Kanawha County Magistrate Judge prior to searching it. (*Id.*) The search yielded the following items: "a digital scale, multiple empty plastic sandwich bags, two folds of paper containing small amounts of fentanyl, approximately 260 grams of methamphetamine, two pistols, defendant's state-issued Louisiana identification card, a Greyhound ticket bearing defendant's name, a prescription pill bottle bearing defendant's name, and an American Airlines boarding pass bearing defendant's name." (*Id.* at 5-6.)

b. *March 17, 2022*

The second seizure occurred on March 17, 2022. Again, the facts begin with an officer receiving a tip about drug activity. This time, Sergeant Snyder of the Parkersburg Police Department got information from the local drug task force regarding drug activity at a home in Parkersburg, West Virginia. (ECF No. 28 at 16-17.) The source described "a black male drug dealer from Charleston, West Virginia" who was "supposed to be staying at the residence and selling drugs." (*Id.* at 17.) The tip came from an informant who had previously provided corroborated information and who lived at the residence in question. (*Id.*) Additionally,

4

Sergeant Snyder had recently participated in executing two separate search warrants at the residence, both of which yielded drugs. (*Id.*)

With this information, Sergeant Snyder went to the residence and spotted a vehicle with an out-of-state license plate parked in front of it. (ECF No. 28 at 17.) Eventually, Sergeant Snyder observed the vehicle leave the residence and decided to follow. (*Id.*) Shortly after, Sergeant Snyder noticed that the vehicle was traveling within one car length of another vehicle in front of it, so he stopped the vehicle for violating a local ordinance prohibiting such behavior. (*Id.* at 17-18.)

After stopping the vehicle, Sergeant Snyder spoke to the two occupants. (ECF No. 28 at 18.) At that time, he learned that the driver did not have a driver's license or any other state-issued identification. (*Id.*) Instead, the driver offered only his name and date of birth, as well as the fact that he was from Charleston, West Virginia. (*Id.*) The passenger—later identified as Defendant—had a state-issued identification card from Louisiana. (*Id.*) During this initial interaction, Sergeant Snyder noted that Defendant's "hand was shaking and that he was breathing heavily." (*Id.*) Sergeant Snyder also discovered that the rental agreement for the car was under a third party's name. (*Id.*)

Sergeant Snyder then began issuing a citation to the driver for following too closely. (ECF No. 28 at 18.) While writing this citation, Sergeant Snyder called for a canine, and "requested a dispatcher to check both occupants for warrants and to see if the driver had a valid license to drive." (*Id.*) The citation process was then disrupted when a "male pedestrian approached the traffic stop" and leaned "inside the driver's window" to "speak[] with the driver." (*Id.* at 18-19.) This diversion required Sergeant Snyder to clear the man from the vehicle for safety. (*Id.* at 19.)

5

Around this time, and while still awaiting the requested information from dispatch, Sergeant Snyder "also placed a brief call to" Detective Morris of MDENT in Charleston. (ECF No. 28 at 19.) Detective Morris told Sergeant Snyder that he was "familiar with both occupants and knew them both to be involved in controlled substance use and/or distribution." (*Id.*)

Before Sergeant Snyder could complete the citation, dispatch informed him that the name and date of birth was associated with a valid license, and neither occupant had any outstanding warrants. (ECF No. 28 at 20.) Then, as Sergeant Snyder approached the vehicle to finish the citation, Officer Dennison arrived with a canine. (*Id.*) Sergeant Snyder told the occupants that the canine would sniff the area of the vehicle while he completed the citation. (*Id.*) When he told them this, Sergeant Snyder saw that Defendant "slump[ed] over in his seat." (*Id.*) The canine sniff then provided a positive indication for the odor of controlled substances on the vehicle. (*Id.*) Importantly, it is undisputed that the sniff was completed before the citation was finished.

As a result of this indication, the two occupants "were removed from the vehicle and officers began to search it." (ECF No. 28 at 20.) After discovering a pistol in the vehicle, Defendant "was placed under arrest, patted down, and seated in the back of a police vehicle." (*Id.*) Before this though—and prior to receiving a *Miranda* warning—the two occupants were asked about the pistol, and Defendant "stated that someone had been attempting to sell him the gun and that it was not stolen." (ECF No. 40 at 3.)

While in the police vehicle, Defendant was seen "moving around." (ECF No. 40 at 3.) This behavior led the officers to again search Defendant, as well as the backseat of the police vehicle. (*Id.*) From this search, the officers discovered "methamphetamine and fentanyl on the floorboards and on the seat, which had apparently been concealed on defendant's person prior to

6

him being placed in the police vehicle." (*Id.*) The citation was then completed and issued to the driver, ending the encounter. (ECF No. 28 at 21.)

c. Procedural Background

Trial in this case is currently set for January 17, 2023. (ECF No. 48.) In advance of this, on October 5, 2022, Defendant filed the pending Motion to Suppress Evidence. (ECF No. 26.) The Government filed its response in opposition on October 17, 2022. (ECF No. 28.) The Court then held a pre-trial motion hearing on October 20, 2022. (ECF No. 31.) At the hearing, the Court ordered the parties to file additional briefing on the suppression issue. (ECF No. 33.) As a result, on October 26, 2022, Defendant filed a second memorandum in support of his motion to suppress. (ECF No. 39.) Finally, on November 1, 2022, the Government filed their supplemental response as well. (ECF No. 40.) Thus, the motion is fully briefed and ripe for adjudication.

II. DISCUSSION

Because Defendant's motion seeks to exclude all evidence obtained from both previously described encounters, the Court will address them individually.

a. December 27, 2021

There are two distinct seizures that occurred on this date. First, the Defendant's bag was seized after he dropped it. Second, property from Defendant's person was seized later in the encounter. Because the bag was abandoned and the officers had reasonable suspicion to search Defendant's person, both seizures were proper.

1. Defendant's Bag

7

The basic facts surrounding this seizure are undisputed. It began when Defendant left the McDonald's in the opposite direction of Detective Johnson's approach, and Patrolman Clendenin requested that Defendant stop to talk with the officers. (ECF No. 26 at 5, ECF No. 28 at 4.) At this time, Defendant is correct that he was "not obliged to respond" and could have gone about his business. (ECF No. 26 at 5 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).) That is not what Defendant did though. Instead of stopping or simply walking away, he "threw down his duffel bag" and ran from the officers. (ECF No. 28 at 4.) After a short chase, the officers recovered the bag, set it aside, and obtained a warrant to search it. (*Id.* at 5.)

These facts drive the analysis here. That Defendant took flight is "suggestive of" "wrongdoing," and the officers were therefore "justified in suspecting that [he] was involved in criminal activity, and . . . in investigating further." *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000). Further, by throwing his bag down and fleeing, Defendant "voluntarily abandon[ed] his property." *United States v. Kirlew*, 291 Fed.Appx. 536, 538 (4th Cir. 2008). In doing so, he "los[t] any reasonable expectation of privacy in the property." *United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995).

Defendant can hardly be surprised by this outcome either. The bag was plainly "relinquished . . . to make flight easier." *Kirlew*, 291 Fed.Appx. at 538 (citation omitted). Anyone could have come by and taken or looked through it. In fact, the bag was *unzipped* with at least some of its contents visible to the public. (ECF No. 28 at 7.) This abandonment was a direct result of "defendant's own acts," and no constitutional violation occurred "when the officers examined the contents . . . after [it] had been abandoned." *California v. Hodari D.*, 499 U.S. 621, 629 (1991) (quoting *Hester v. United States*, 265 U.S. 57, 58 (1924)).

8

Defendant's only real challenges to this abandonment are factual claims that (1) he did not run as far as Patrolman Clendenin says he did, and (2) he did not drop the bag until he surrendered and stopped fleeing. Neither of these arguments appear anywhere in Defendant's briefing but were instead raised only at the motion hearing.

First, regarding the distance of the chase, Defendant testified at the motion hearing that the pursuit went for between five and eight yards, while Patrolman Clendenin claimed it was between 30 to 40 yards. The length of the chase is irrelevant though.[1] What matters is if Defendant dropped his bag and left it to flee. Whether he changed his mind later, i.e., when he refused consent to search the bag, does not affect the abandonment analysis, and Defendant has shown no reason why it should. *See United States v. Stevenson*, 396 F.3d 538, 546 (4th Cir. 2005) ("When a person voluntarily abandons his privacy interest in property, his subjective expectation of privacy becomes unreasonable.")

Second, Defendant's account of when he dropped the bag directly conflicts with Patrolman Clendenin's recollection of the event. According to Defendant, he dropped the bag and immediately surrendered. On the other hand, Patrolman Clendenin testified that Defendant dropped the bag and continued his flight. Strengthening Patrolman Clendenin's story, Detective

---

[1] Though irrelevant to the abandonment analysis, the Court notes that it finds Patrolman Clendenin's testimony more credible than Defendant's, particularly in light of the area's geography and the distance from the McDonald's to the adjacent property where both parties agree the chase ended. (ECF No. 26 at 5 (Defendant was pursued "to the adjoining Go-Mart gas station."), ECF No. 28 at 4 (Defendant was caught "in the Go-Mart parking lot.").), *see also* Distance Between McDonald's and Go-Mart on MacCorkle Avenue SE, GOOGLE MAPS, http://maps.google.com (follow "Directions" hyperlink; then search starting point field for "McDonald's, 6414 MacCorkle Ave SE, Charleston, WV 25304" and search destination field for "Go Mart #31, 6414 MacCorkle Ave SE, Charleston, WV 25304").

Johnson testified that Patrolman Clendenin gave him the same version of events immediately after the chase. Therefore, after observing the witnesses, considering their testimony, and assessing the credibility of both Defendant and the officers, the Court finds that it is far more likely that Patrolman Clendenin is correct that Defendant dropped his bag then continued fleeing. *See Murray v. United States*, 487 U.S. 533, 543 (1988) ("[I]t is the function of the District Court . . . to determine the facts.").

Further, the officers in this case even obtained a search warrant to search the bag. (ECF No. 26 at 1, ECF No. 28 at 8.) Defendant has not challenged the reasonableness of that search warrant, so the seizure is proper on that basis, too.

   *2. Defendant's Person*

As to the second seizure on December 27, 2021, the Court begins by noting that no seizure occurred until Defendant was stopped by Patrolman Clendenin *after* fleeing. It is well-settled that an officer requesting to speak with a person is not in itself a "seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Thus, Patrolman Clendenin's request to speak with Defendant was "not a seizure" because Defendant did not "yield to [Patrolman Clendenin's] authority." *United States v. Lender*, 985 F.2d 151, 154-55 (4th. Cir. 1993). Only once Defendant "finally submitted to" Patrolman Clendenin's "show of authority by stopping" was Defendant "seized within the meaning of the Fourth Amendment." *United States v. Smith*, 396 F.3d 579, 586, n.5 (4th Cir. 2005).

Despite Defendant's claim that he was arrested for obstruction following the chase, (ECF No. 26 at 6), it is clear to the Court that what occurred remained a valid *Terry* stop.[2] As courts

---

[2] Though this was a *Terry* stop, the distinction is irrelevant because of the previously discussed seizure analysis for the abandoned duffel bag. When the "trained narcotics dog alert[ed]" the officers to contraband in the bag, they certainly also had "probable cause to arrest" Defendant.

10

have made clear, *Terry* stops are not "distinguished by the absence of any restriction of liberty," but by the fact "that they must last no longer than necessary to verify or dispel the officer's suspicion." *Leshuk*, 65 F.3d at 1109. Simply "handcuffing a suspect . . . does not necessarily elevate a lawful stop into a custodial arrest. *Id.* Even a "complete restriction of liberty is valid under *Terry*" as long as it is "brief." *Id.*

At no point does Defendant argue that the *Terry* stop in this case was longer than necessary, and the facts show why. Here, the officers wanted to question Defendant regarding his "unusual conduct" which led them to "reasonably conclude in light of [their] experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). When the officers attempted to approach Defendant, he fled, enhancing their suspicions and extending the time "necessary" for the officers "to verify or dispel [their] suspicion." *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007) (citation omitted).

Once Defendant was caught, Detective Johnson's search of his person consisted of "merely reach[ing] for and remov[ing]" the knife Defendant was carrying—a permissible search during a *Terry* stop for the officers' safety. *Terry*, 392 U.S. at 30. Following the knife's removal, Defendant "consented to a search of his person" that yielded the remaining evidence. (ECF No. 28 at 5.) The dog sniff occurred at this time, too, and it was the positive indication on the bag that created "probable cause to arrest" Defendant and extend his detention. *Sinclair*, 983 at 601.

---

*United States v. Sinclair*, 983 F.2d 598, 601 (4th Cir. 1993). Further, though a finding of probable cause is unnecessary here, the Court still notes that it likely existed following Defendant's flight as "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [Defendant] had committed or was committing an offense." *See United States v. McCraw*, 920 F.2d 224, 227 (4th Cir. 1990).

The *Terry* stop was proper as the officers at least had "'reasonable' suspicion,' based on articulable, particularized facts, that 'criminal activity, may be afoot." *United States v. McCoy*, 513 F.3d 405, 410-11 (4th Cir. 2008) (quoting *Terry*, 392 U.S. at 30). Reasonable suspicion is a "commonsense, nontechnical conception[] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695-96 (citations omitted). In determining whether reasonable suspicious exists, "a court must look to the totality of the circumstances." *McCoy.* at 411. Finally, the Court notes that it must "give due weight to the factual inferences drawn by police officers as they investigate crime." *Id.*

With this standard in mind, at least five facts supported the officers' reasonable suspicion.

*First*, Detective Johnson received a tip from a source regarding drug activity in the room where Defendant was staying. (ECF No. 28 at 10.) When assessing tips like this, "an officer can judge the credibility of the tipster firsthand." *United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004). In this case, Detective Johnson's surveillance discovered a person matching the tip staying in the room described, which contained visible drug paraphernalia. (ECF No. 28 at 3.) This "important corroboration" helps to build reasonable suspicion. *Perkins*, 363 F.3d at 322.

*Second*, Detective Johnson possessed knowledge of the Knights Inn as a location frequented by drug traffickers. (ECF No. 28 at 11.) In determining whether "circumstances are sufficiently suspicious to warrant further investigation," officers may consider "the relevant characteristics of a location." *Wardlow*, 528 at 124. Thus, Detective Johnson's past experience and knowledge regarding the Knights Inn supported his reasonable suspicion. *See Perkins*, 363

F.3d at 321 (noting that awareness of an area being "a high crime, drug-ridden neighborhood" helped create reasonable suspicion).

*Third*, Detective Johnson observed items in Defendant's hotel room that the detective "knew, based on his training and experience, to be indicative of drug trafficking." (ECF No. 28 at 11-12.) These items included plastic baggies, "well-known tools of the narcotics distribution trade," *United States v. Fisher*, 912 F.2d 728, 731 (4th Cir. 1990), and a digital scale, further "circumstantial evidence of intent to distribute narcotics," *United States v. Madina*, 474 Fed.Appx. 919, 921 (4th Cir. 2012).

*Fourth*, when Detective Johnson questioned the driver who brought Defendant to Room 115, she "lied about where she had dropped defendant off." (ECF No. 28 at 12.) She then "admitted that she lied" to Detective Johnson "in order to avoid suspicion." (*Id.*) "False statements"—such as the driver's—"can be considered in establishing reasonable suspicion." *United States v. Bowman*, 884 F.3d 200, 216 (4th Cir. 2018). In addition to lying, the driver also confessed that "she had been paid ten dollars for giving the male a ride." (ECF No. 28 at 3.) Based on his training and experience, Detective Johnson found these "actions and statements . . . to be suspicious." (*Id.*)

*Fifth*, Detective Johnson observed evasive behavior from Defendant. As he left his room, Defendant "looked around nervously." (ECF No. 28 at 12.) He then "paced back and forth" in the McDonald's "without approaching the purchase counter." (*Id.*) Continuing this pattern of behavior, Defendant avoided Detective Johnson as the officer entered the restaurant. (*Id.*)

This "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 125. Though Defendant's actions so far "f[ell] short of headlong flight,"

13

his "evasive conduct" still supports a finding of reasonable suspicion. *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004). Ultimately, the officers already had reasonable suspicion, but even if they did not, Defendant guaranteed that they did by performing the "consummate act of evasion," "[h]eadlong flight." *Wardlow*, 528 U.S. at 124.

Each of these facts by itself is not necessarily proof of illegal conduct. However, there is "a degree of suspicion that attaches" to each of them. *Illinois v. Gates*, 462 U.S. 213, 243, n.23 (1983). From the officers' perspective and "in light of their experience and training," these facts together aroused suspicion. *Perkins*, 363s F.3d at 321, *see also Lender*, 985 F.2d at 154 (Courts are "not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street."). Thus, the Court finds that, taken together, the facts are enough to "amount to reasonable suspicion." *United States v. Sokolow*, 490 U.S. 1, 9 (1989).

As a final matter on this encounter, the Court notes that Defendant makes much of the officers' failures to turn on their body cameras in "repeated violation of CPD policy." (ECF No. 39 at 1-3.) The officers may very well have been in violation of the Charleston Police Department's policy, and Defendant may even be right that it would be wise for the officers to have the cameras on. Nevertheless, nothing suggests that a lack of body camera footage amounts to a constitutional violation or other legal deficiency. Defendant has put forth no evidence otherwise, and so this fact does not alter the Court's finding.

b. *March 17, 2022*

The Court next turns to the traffic stop. On this, Defendant chiefly contends that the stop was "unlawfully extended to wait for a canine unit." (ECF No. 26 at 7.) Yet the facts tell a different story.

As an initial matter, it is undisputed that "the stop was legitimate at its inception." *Bowman*, 884 F.3d at 209 (citation omitted). Based on his observations, Sergeant Snyder undoubtedly had "probable cause to believe that a traffic violation occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). The only question then is whether Sergeant Snyder's actions during the stop violated Defendant's Fourth Amendment rights. *Bowman*, 884 F.3d at 209. They did not.

The traffic stop lasted just over 15 minutes. (*See* ECF No. 28 at 21.) Given the various impediments to Sergeant Snyder's issuance of the citation, the Court finds that no extension occurred. These obstacles included a third-party man arriving and disrupting the scene, a lack of identification from the driver, and the time needed to wait for dispatch to confirm the identity of the driver and supply other information.

At no point did Sergeant Snyder stop performing the necessary tasks related to the traffic violation during the stop. He called for canine assistance while issuing the citation and then was waiting for dispatch to complete the license check on the driver. (ECF No. 28 at 21.) In fact, by the time dispatch was able to confirm that the driver did have a valid license, Canine Officer Dennison had *already* arrived on the scene. (*Id.*) As such, it would have been impossible for Sergeant Snyder to complete the citation prior to the arrival of the canine.

It is true that a "dog sniff around [a] vehicle's perimeter for the purpose of detecting narcotics 'is not an ordinary incident of a traffic stop.'" *Bowman*, 884 F.3d at 210 (quoting *Rodriguez v. United States*, 575 U.S. 348, 356 (2015)). However, an officer may "conduct an investigation *unrelated* to the reasons for the traffic stop as long as it '[does] not lengthen the roadside detention.'" *Id.* (quoting *Rodriguez*, 575 U.S. at 354). Dog sniffs specifically can be

15

performed without the need for any articulable level of suspicion as a dog sniff in itself "does not compromise any legitimate interest" and is therefore "not a search subject to the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (citation omitted).

Because Officer Dennison oversaw the canine sniff, Sergeant Snyder did not have to divert his time on that task, and the sniff was "performed within 'the time reasonably required' to issue a traffic citation." *United States v. Branch*, 537 U.S. 328, 335 (4th Cir. 2008) (quoting *Caballes*, 543 U.S. at 407). Only once the canine provided a positive identification was the stop extended. Then, with the positive identification, the officers had probable cause to search the vehicle. *United States v. Cunningham*, 213 Fed.Appx. 214, 215-16 (4th Cir. 2007). Defendant does not contest this.

Rather, Defendant claims that although the firearm itself "cannot be suppressed," the drugs found on Defendant can and should be suppressed. (ECF No. 39 at 3.) Defendant asserts that this is because his arrest was based only on his statement about the recovered firearm. Further, he contends that "unwarned statements 'may not be considered in determining whether there was probable cause' for . . . an arrest." (*Id.* (quoting *Commonwealth v. White*, 371 N.E.2d 777, 781 (Mass. 1977), *aff'd sub. nom. Massachusetts v. White*, 439 U.S. 280 (1978)).)

Before addressing the arrest itself, the Court notes that whether a *Miranda* violation occurred is irrelevant to the evidence Defendant hopes to suppress. Defendant concedes that "*Miranda* is merely a prophylactic measure," and that the "fruit of . . . unwarned statements . . . cannot be suppressed." (ECF No. 39 at 3.) Even without this concession though, the Fourth Circuit recently confirmed that the physical fruits of unwarned statements are admissible. *See United States v. Oleyede*, 933 F.3d 302, 308-310 (4th Cir. 2019) (citation

16

omitted). This is particularly true where—as here—physical evidence was obtained as the result of a "voluntary statement," a characterization Defendant does not contest. *United States v. Patane*, 542 U.S. 630, 636 (2004) (plurality opinion). As such, the Court declines to make a finding on the issue and instead focuses on whether the evidence should be suppressed.

Statement or no, the Government correctly points out that Sergeant Snyder had probable cause to arrest Defendant "based on his constructive possession of the firearm." (ECF No. 40 at 10.) The presence of the firearm alone created "an entirely reasonable inference . . . that any or all of the car's occupants had knowledge of, and exercised dominion and control over," the firearm. *Maryland v. Pringle*, 540 U.S. 366, 372 (2003). Additionally, there is no dispute that Sergeant Snyder "was informed by a dispatcher that defendant was a convicted felon." (ECF No. 40 at 3.) Thus, "viewed from the standpoint of an objectively reasonable police officer," Sergeant Snyder had probable cause to arrest Defendant for being a felon in possession of a firearm in violation of West Virginia Code § 61-7-7(a)(1) or 18 U.S.C. § 922(g)(1). *Pringle*, 540 U.S. at 371 (citation omitted). The arrest was therefore lawful, and none of the evidence gathered afterwards is tainted in any way.

### III. CONCLUSION

For these reasons, the Court **DENIES** the pending motion to suppress. (ECF No. 26.)

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: December 28, 2022

_____
THOMAS E. JOHNSTON, CHIEF JUDGE

18